UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>BOBBY WAYNE RUSSELL<br><br>Defendant. | Case No. 23-cr-29 (APM) |

### UNITED STATES' SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Bobby Wayne Russell to 30 months of incarceration, at the mid-point of the advisory guideline range of 27 to 33 months, 36 months of supervised release, $2000 in restitution, and the mandatory special assessment of $100.

I.  INTRODUCTION

The defendant, Bobby Wayne Russell, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1] Russell was part of a crowd of rioters resisting, interfering with, and generally harassing

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

1

United States Capitol Police ("USCP") and Metropolitan Police Department ("MPD") officers who were struggling to contain and stop the forward progress of the rioters toward the Capitol building. Fully utilizing his size and strength, he latched on to a segment of a bike rack barrier with his hands and arms, and refused to budge, despite multiple police commands to "back off," and despite being sprayed with a crowd control chemical agent. Due to the action of other rioters, the barrier broke apart, affording Russell direct access to the officer who had sprayed him. Russell tried unsuccessfully to grab the officer's spray cannister, then lost his footing. He grabbed a fistful of the officer's jacket and forcefully pulled her down the stairs as he fell headlong. They both ended up on the ground. Later, on the Upper West Terrace, Russell pressed his body up against the shields of officers trying to clear the area of rioters. He taunted officers in that location, saying, among other things, "There's more of us than of you guys; you're gonna lose." The United States recommends that the Court sentence Russell to 30 months of incarceration for his violation of 18 U.S.C. § 111(a)(1). A 30-month sentence reflects the gravity of Russell's conduct, but also acknowledges his early admission of guilt.

## II.  FACTUAL BACKGROUND

### A.  The January 6, 2021 Attack on the Capitol

The United States refers the Court to the stipulated Statement of Offense filed in this case, ECF No. 9, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.  Russell's Role in the January 6, 2021 Attack on the Capitol

#### a.  Russell's assaultive conduct at the Capitol

2

On the morning of January 6th, after attending the "Stop the Steal" rally at the Ellipse, then 46-year-old Russell walked with his wife and the crowd to the Capitol.[2] By 1:56 p.m., he was on the southwest side of the Capitol and a short set of steps leading to the lawn. At that location, he was among rioters angrily confronting police who were trying to maintain the integrity of a bike rack barricade at the top of the steps. Russell and other rioters were attempting to pull down the barricade. His demeanor was hostile and oppositional. He repeatedly used his back and buttocks to press up against the bike rack barrier. *See* Image 1, below (Exhibit 1).



*Image 1 – Russell pressing his buttocks against a bike rack barricade*[3]

Russell did not comply with officer commands to "back off the fence" and "back up." On the contrary, he gripped the bike rack bars with his hands, and he reached over the top to clench it between his upper arm and side. *See* Images 2 and 3, below.

---

[2]  Russell's wife has not been charged with any offense on January 6, 2021.
[3]  Image 1 is a screen shot at 1:00 from the BWC video of Officer M.R.



*Image 2 – Russell gripping bike rack[4]*



*Image 3 – Russell clenching bike rack against his body[5]*

Seeing that her fellow officers were not able to push Russell away from the barricade, Officer M.T. sprayed Russell with a crowd-control chemical agent.  *See* Images 4 and 5 below.

---

[4] Image 2 is a screen shot at 1:09 from the BWC video of Officer M.T.
[5] Image 3 is a screen shot at 1:21 from the BWC video of Officer M.R.



*Image 4 – Russell (in white baseball cap) being sprayed by Officer M.T. (spray cannister framed in blue)[6]*



*Image 5 – Russell still holding onto bike rack after being sprayed[7]*

---

[6] Image 4 is a screen shot at 1:07 from the BWC video of Officer M.T.
[7] Image 5 is a screen shot at 0:09 from the BWC video of Officer S.C-B.

Russell attempted unsuccessfully to grab the spray cannister after Officer M.T. sprayed him. Right around that time, in the midst of the chaos, the barrier suddenly broke apart due to the action of other rioters. That gave Russell direct access to Officer M.T. He grabbed a fistful of the officer's yellow jacket. At that point, he appears to have lost his footing. Russell pulled Officer M.T. forcibly toward and over him as he fell headlong down the flight of stairs. *See* Images 6 and 7, below (Exhibit 2).



*Image 6 – Russell grabbing Officer M.T.'s jacket[8]*

---

[8] Image 6 is a screen shot at 0:18 from the BWC video of Officer S.C-B.



*Image 7 – Russell gripping Officer M.T.'s jacket[9]*

Officer M.T. landed on top of Russell and another other officer on the ground.[10]   *See* Image 8, below.



*Image 8 – Officer M.T. (framed in blue) after being pulled down the stairs[11]*

---

[9] Image 7 is a screen shot at 0:05 from the BWC video of Officer J.M.
[10] Officer M.T. was not injured.
[11] Image 8 is a screen shot at 0:13 from the BWC video of Officer A.P.

7

Russell and his wife later advanced to the Upper West Terrace. At about 3:25 p.m., in the area outside the Senate Wing Door, Russell confronted and engaged with officers on the Upper West Terrace. He told Officer C.B., "I'm not scared of you, and I'm not weak." See Image 9, below.



*Image 9 – Russell challenging officers[12]*

At 3:25 p.m., he joined in a "Who's house – our house!" chant. At 3:30 p.m., he said to officers, "Did y'all think it was gonna come to this? I knew it was gonna come to this."

At 4:20 p.m., officers guarding the area formed a line and began walking towards the rioters gathered in the area, repeatedly shouting, "move back," in an effort to clear the area. Despite these orders, Russell refused to budge and, instead, pushed his back and buttocks into the shield of at least one Prince George's County police officer, Corporal J.B. See Image 10, below (Exhibit 3).

---

[12] Image 9 is a screen shot at 1:36 from the BWC video of Officer C.B.



*Image 10 – Russell pressing against officer's shield on Upper West Terrace*[13]

When interviewed, Corporal J.B. recalled that Russell had said, "There's more of us than you guys; you're gonna lose."

By the time he left at approximately 4:32 p.m., Russell had been on the restricted grounds of the Capitol for approximately 3 hours and 15 minutes.

After January 6, Russell defended his participation in the events of January 6th with following Facebook post:



---

[13] Image 10 is a screen shot at 1:12 from the BWC video of Officer C.F.

### III.   THE CHARGES AND PLEA AGREEMENT

On January 25, 2023, a grand jury returned an indictment charging Russell with seven counts, including Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. §111(a)(1) (Count One). On June 26, 2023, Russell pleaded guilty to Count One pursuant to a written plea agreement.

### IV.   STATUTORY PENALTIES

Russell now faces sentencing on one Count of Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. §111(a)(1).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to eight years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

### V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). As the parties and the Probation Office agree, the Guidelines analysis for this matter follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2A2.2(a)) | 14 |
| Adjustment – Official Victim (U.S.S.G. § 3A1.2(b)) | + 6 |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | <u>- 3</u> |
| **Total Adjusted Offense Level:** | **17** |

*See* Plea Agreement at ¶ 5(A).[14]

---

[14] Pursuant to U.S.S.G. § 2A2.4(a), the Base Offense Level for a Section 111 offense is 10. But when the assault constituted "aggravated assault," the cross-reference in U.S.S.G. § 2A2.4(c)(1) states that the court should apply U.S.S.G. § 2A2.2. An aggravated assault includes a "felonious assault that involved…a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon;" or an "intent to commit another felony." U.S.S.G. § 2A2.2, cmt. n.1.

The U.S. Probation Officer calculated Russell's criminal history as Category II, which is not disputed. Therefore, no adjustment under U.S.S.G. § 4C1.1 applies. Accordingly, based on both the Probation Officer's and the parties' calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at Level 17, Russell's Guidelines imprisonment range is 27 to 33 months' imprisonment.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a term of incarceration of at least 30 months.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Russell's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, thwarting the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Russell attacked a police officer who was trying to defend the Capitol building. He pulled her down a set of stairs, an assault that could easily have injured her, and which exposed her to even greater danger at the hands of the mob. Thereafter, Russell persisted in opposing officers both physically and verbally. The nature and circumstances of Russell's offense

---

The Guidelines do not define "assault" or "felonious assault," and sentencing courts have looked to the common law to define "assault" for Guidelines purposes. *See United States v. Hampton*, 628 F.3d 654, 660 (4th Cir. 2010). Assault encompasses conduct intended to injure another or presenting a realistic threat of violence to another. *See United States v. Dat Quoc Do*, 994 F.3d 1096, 1099 (9th Cir. 2021) (federal common-law assault includes (1) "a willful attempt to inflict injury upon the person of another," or (2) "a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm.") Russell Assaulted Officer M.T. by grabbing her jacket and pulling her down the stairs. Additionally, Russell admitted that he forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with a police officer, and that he did so with the intent to impede and interfere with the officer in the lawful performance of her official duties during a civil disorder in violation of 18 U.S.C. § 231(a)(3). ECF 28 at ¶ 12, 13.

were serious, and fully support the government's recommended sentence of 30 months.

### B. The History and Characteristics of the Defendant

Russell's criminal history is substantial. He has four prior felony convictions — two convictions for Possession of a Controlled Substance (methamphetamine), as well as a conviction for Theft of Property (thousands of pounds of scrap metal stolen from a business), and a conTviction for Burglary, all occurring in 2010 and 2011. In 2011, Russell was sentenced to ten years' incarceration for each offense, but all of his sentences were suspended. In connection with one of his prior convictions, he was alleged to have punched one of the arresting officers in the head; however, felony Assault and Resisting Arrest charges were dismissed pursuant to a plea agreement. PSR ¶ 47. Similarly, Russell had a Resisting Arrest charge in 2010 that was dismissed. PSR ¶ 52. He also had an Aggravated Assault charge in 1998 in which he allegedly struck another individual in the head, causing a deep gash, that was also dismissed. PSR ¶ 51.

Russell has a history of drug abuse (specifically, methamphetamine), but advised the Probation Office that he went to treatment in 2013 and has not used any drugs since that year. PSR ¶¶ 73-76. The United States is unaware of any evidence that intoxication played a role in the commission of the instant offense.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Russell's assaultive conduct toward and forcible resistance of police officers on January 6th showed abject disrespect for the law. The officers were simply doing their jobs, defending and protecting the United States Capitol building and the people inside, but Russell acted with complete disregard of that fact. He ignored their commands. He challenged them verbally and physically. In the midst of a chaotic situation, he grabbed Officer M.T. and pulled her down the stairs. She could have been seriously injured had she landed directly on the stairs instead of on

top of Russell and another officer. He deliberately used his weight and strength to impede and interfere with the efforts of the officers, contributing to the breakdown of the bike rack barrier. In addition to his assaultive conduct, Russell taunted individual officers, with the apparent intent of convincing them that it was futile to oppose the will of the mob.

**D. The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[15] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a sentence of 30 months incarceration.

Russell pled guilty within six months of being indicted. Although he was emotional at the plea hearing, the reason for his emotion is not clear (was he remorseful, or was he distressed that he was facing incarceration?). He has not provided any statement of remorse in connection with the pre-sentence investigation. Nor did he express any remorse to law enforcement when interviewed in connection with the investigation. His attitude at that time may be surmised from the following statement: "If I did it, I did it. I did not intend to hurt anyone." His attempt to blame "antifa" for violence, when he personally attacked a police officer, also indicates a need for specific deterrence and a lack of acknowledgment of the basic circumstances of the offense. Given his criminal history and his conduct at the Capitol, a sentence of 30 months' incarceration is appropriate to deter Russell

---

[15] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

13

from engaging in similar behavior in the future.

E.  **The Importance of the Guidelines**

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

F.  **Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v.*

*Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[16]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders

---

[16] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[17]

Although the other defendant discussed below participated in the Capitol breach on January 6, 2021, several salient differences explain the differing recommendation and sentence. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentence in the following case provides a suitable comparison to the relevant sentencing considerations in this case.

In *United States v. Thomas Hamner*, Case No. 21-cr-689 (ABJ), Hamner helped facilitate access to the west lawn for thousands of rioters by tearing down a portion of snow fencing barrier. Later, on the West Plaza, he struggled with officers for control of a separated segment of bike rack barricade. Finally, he participated in a group effort to thrust a very large, metal-framed Trump billboard into a defensive line of officers. Those officers were forced to grab and push the sign away to avoid being harmed. Unlike Russell, Hamner did not lay hands on any officer. Hamner pled to Civil Disorder, in violation of 18 U.S.C. 231(a)(3), and Judge Jackson sentenced him to 30 months of incarceration.

In *United States v. Kevin Galetto*, Case No. 21-cr-517 (CKK), Galetto made his way to the Lower West Terrace tunnel after police lines were overrun on the West Plaza. He was one of the first rioters to enter and advance against the police line inside the tunnel. He pushed against one of the officers and tried to take his shield. He later re-entered the tunnel and was part of another push against officers attempting to block access to the tunnel. Galetto pled guilty to Assaulting, Impeding, or Resisting Certain Officers, in violation of 18 U.S.C. 111(a), and Civil Disorder, in

---

[17] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

violation of 18 U.S.C. 231(a)(3). Like Russell, Galetto had an Offense Level of 17, but unlike Russell, Galetto was in Criminal History Category I, and so faced a guideline range of 24 to 30 months' incarceration. Judge Kollar-Kotelly sentenced Galetto to 27 months' incarceration. Similarly, a sentence at the midpoint of the guideline range is appropriate here.

## VII. RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[18] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Herrington must pay $2,000 in restitution, which reflects in part the role Herrington played in the riot on January 6.[19] Plea Agreement at ¶ 12. As the plea

---

[18] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[19] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9

agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July, 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Herrington's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 108.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[20]

---

(D.D.C. 2012) (citations omitted).

[20] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii),

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for her individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.");

More specifically, the Court should require Russell to pay $2,000 in restitution for his conviction. This amount fairly reflects Russell's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII. CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 30 months' imprisonment, 36 months of supervised release, $2,000 in restitution, and

---

3663A(c)(3)(B).

the mandatory special assessment of $100.

                    Respectfully submitted,

                    MATTHEW M. GRAVES
                    UNITED STATES ATTORNEY

BY:     */s/  David J. Perri*
          DAVID J. PERRI
          WV Bar No. 9219
          Assistant United States Attorney (Detailed)
          United States Attorney's Office